McCREERY v. DAVIS.

1. MARRIAGE.—The marriage relation considered, and held to be in this State, as at common law, not simply a status, but a relation springing from a civil contract, with incidents and limitations attaching by the law of the land to the marriage contract when entered into, notwithstanding that under this same law it is made to differ in many particulars from other civil contracts.

2. IBID.—FOREIGN DIVORCE—JURISDICTION—DOWER—SPECIFIC PERFORMANCE. A citizen of this State married a woman of New York in that State, and forthwith brought her with him to his South Carolina home, where they lived together as man and wife for a few years, when the wife left him and took up her residence in the State of Illinois, and there in time obtained a decree of divorce from the proper court in Illinois on the ground of cruelty, the husband being at his home in South Carolina, and served only by publication, and not appearing to the action. *Held*, that this judgment of the court of Illinois would not be recognized in the courts of South Carolina, where divorces are not allowed for any cause, and that the Constitution of the United States, and the act of Congress in pursuance thereof, do not require such recognition, as the court in Illinois never acquired jurisdiction of the person of the husband. Therefore, this wife has an inchoate right of dower in lands owned by the husband during coverture, whether purchased before or after the Illinois decree of divorce, and a purchaser of such lands from the husband will not be decreed to specifically perform his contract where the tendered deeds have no renunciation of his wife's dower endorsed thereon.[1]

1 The validity of a divorce rendered against a non-resident defendant, who is made a party only by constructive service of process, is the subject of an extended note to Butler v. Washington (La.), 19 L. R. A., 814, while the effect of an appearance by a non-resident, to give jurisdiction in such case, is the subject of annotation to Ellis' Appeal (Minn.), 23 L. R. A., 287.—REPORTER.

3. Divorce in South Carolina.—Under the Constitution of South Carolina, the legislature cannot grant a divorce, but it may be granted only by the Court of Common Pleas, and by that court only in such cases as may be prescribed by law. And the law having prescribed no cases in which the courts may grant divorces, none can be granted *a vinculo matrimonii* in South Carolina, but the Court of Common Pleas may decree a divorce *a mensa et thoro*.

4. Foreign Divorce—Effect.—If the contract of marriage in this case should be construed according to the law of the State (New York) where made, and not by the law of the State (South Carolina) where it was to be performed, the result would be the same, as the laws of New York do not allow divorces for *sævitia*, nor recognize as binding upon her citizens divorces obtained in other States on grounds not deemed sufficient in New York.

5. Divorce in South Carolina.—Section 2029 of General Statutes, which declares second marriages void where the first has not been dissolved by death, provided that this section shall not extend to any person who shall be divorced, applies only to cases where there has been a divorce recognized as legal by the laws of South Carolina.

6. Ibid.—Dower—Estoppel.—The wife would not be estopped by her divorce proceedings from claiming dower in these lands—not because she is not a party to this action, but—because, on the valuable consideration of marriage she obtained her right of dower, and obtaining a decree of divorce in another State is not made by law a ground of forfeiture of dower.

Before Witherspoon, J., Richland, April, 1893.

Action by Charles W. McCreery against J. Henry Davis for specific performance, commenced February 3, 1893. From a decree dismissing the complaint, the plaintiff appealed on the following grounds: 1. Because his honor held that, "according to the uniform decisions of the courts of this State, marriage has been adjudged to be a civil contract." 2. Because his honor held that, "assuming that marriage is a *civil status*, that can be modified or changed by the law of the domicile, it does not follow that the judgment of divorce changing the matrimonial status of Mrs. Rhoda McCreery in Illinois can have the effect of dissolving the matrimonial status or relations of her husband as a citizen of South Carolina. It cannot have such effect, if, as universally conceded, each State has the sovereign right to fix and regulate the *domestic status* of its *own citizens*. The judgment of divorce granted Mrs. Rhoda McCreery in Illinois cannot affect the mat-

rimonial status of her husband, Charles W. McCreery, as a citizen of this State, under section I., of article IV., of the Constitution of the United States, giving faith and credit to foreign judgments in this State. This provision of the Constitution of the United States was never intended to afford one State the means of fixing or changing the material status of the citizen of another State, in hostility to the laws and public policy of the latter State, with reference to marriage. To give such effect to this constitutional provision, would be to authorize one State to *legislate* for, and to control, the domestic policy to govern in another State. If divorces could be granted for any cause *in this State,* public policy might demand a recognition in this State of the judgment of divorce granted in Illinois. No country will, however, consent to recognize a foreign judgment which is contrary to its views of public policy and morality. If one State has the unquestioned right to adopt and enforce its own domestic policy with reference to marriage and divorce, the same right must be accorded to every other State. If Charles W. McCreery's marriage is to be regarded as contracted in South Carolina, his present marital status or condition must be determined by the decisions of our own courts with reference to marriage. This court will not undertake to overrule the well settled law of this State relating to the marriage contract, in order to change the matrimonial status of Charles W. McCreery in this State to suit the changed status of his wife under the laws of Illinois."

3. Because his honor held that, "regarding the marriage of Charles W. McCreery as having been contracted in South Carolina, I conclude, as matter of law, that the judgment of divorce granted in the State of Illinois, at the instance of Mrs. Rhoda McCreery, did not dissolve the matrimonial status of her husband, Charles W. McCreery, in this State. If the judgment of divorce granted in Illinois could have the effect of dissolving the matrimonial relations of Charles W. McCreery in this State, it could not divest the inchoate right of dower of his wife, Mrs. Rhoda McCreery, in the first lot of land referred to in the agreement between plaintiff and defendant, of which Charles W. McCreery was seized in fee *prior* to the date of said judgment of divorce. The Statute of Illinois, also, reserves the

wife's right of dower." 4. Because his honor held that, "if the marriage of Charles W. McCreery is to be regarded as having been contracted in the State of New York, the judgment of divorce granted in Illinois, under the New York decisions, could not have the effect of dissolving the matrimonial relations of Charles W. McCreery." 5. Because his honor held that, "considering the marriage of Charles W. McCreery as contracted either in this State or in New York, |I conclude, as matter of law, that the judgment of divorce granted in Cook County, in the State of Illinois, upon the application of plaintiff's wife, Mrs. Rhoda McCreery, does not dissolve the matrimonial relations of her husband, the plaintiff, Charles W. McCreery, as a citizen of this State." 6. Because his honor erred in passing upon the marital status of Charles W. McCreery, whereas it was only necessary to the decision of this case, to pass upon the marital status of Rhoda McCreery. 7. Because his honor should have held that, under the Constitution of the United States, and the acts of Congress passed in pursuance thereof, the judgment of divorce granted by the courts of Illinois is valid and binding in the courts of this State. 8. Because, it having been admitted that the proceedings for divorce were regular, and the judgment therein valid and in accordance with the laws of the State of Illinois, it was error to hold that the said judgment was ineffectual to dissolve the marriage contract in this State. 9. Because his honor held that "the plaintiff is not entitled to compel specific performance of the agreement by the defendant, J. Henry Davis, and that plaintiff's complaint be dismissed with costs." 10. Because his honor held that "the doctrine of *estoppel* as to 'Mrs. Rhoda. McCreery need not be considered, as she is not a party to this action."

*Messrs. Lyles & Muller*, for appellant.

*Mr. H. Cowper Patton*, contra.

April 20, 1895. The opinion of the court was delivered by

MR. JUSTICE POPE. On the 3d day of January, 1893, the plaintiff and defendant entered into a written agreement,

whereby the plaintiff, for a valuable consideration, agreed to sell and convey to the defendant, free of encumbrance or defect of title of any character, two certain lots of land, situate in the County of Richland, in the State of South Carolina. When the plaintiff tendered his deeds of conveyance of said two lots of land to the defendant, the defendant refused to accept said deeds, claiming that the same were not free from encumbrance or defect of title, in this respect, namely: that there was no renunciation, endorsed on said deed, of the dower of Rhoda Baldwin McCreery, the wife of the plaintiff; and the said defendant still refused said deeds after he had exhibited to him a certified copy of a judgment of the Circuit Court of Cook County, in the State of Illinois, in an action wherein the said Rhoda Baldwin McCreery was plaintiff, and the said Charles W. McCreery was defendant, rendered at the May term, 1891, of said court, and whereby the bond of matrimony theretofore existing between the said Rhoda and Charles was dissolved.

On the 3d of February, 1893, the plaintiff, Charles W. McCreery, commenced his action, by summons and complaint, against the defendant, J. Henry Davis, in the Court of Common Pleas for Richland County, in the State of South Carolina, for a judgment requiring the said J. Henry Davis to specifically perform his contract, and that when the plaintiff, Charles W. McCreery, should deliver his deed, with full warranty, for said two lots of land to the defendant, J. Henry Davis, he should accept the same and pay the purchase money therefor to Charles W. McCreery. The defendant, in his answer, admitted the facts set up in the complaint, "except that he denies that the title offered him by the said plaintiff is free from defects or encumbrances; and he alleges that the said deeds of conveyance offered him by said plaintiff are defective in this, that the said plaintiff is, and at the time mentioned in said complaint was, a married man, and that his wife was, and is now, alive, and that said deeds of conveyance bear no renunciation of dower by his said wife." The cause being thus at issue, came on to be heard by his honor, Judge Witherspoon, at the spring, 1893, term of the Court of Common Pleas for Richland County, in

the State of South Carolina, on the pleadings, and on the following written agreement as to the admitted facts:

"1. That on or about the 4th day of February, 1885, the plaintiff, then, and ever since, a citizen of the city of Columbia, State of South Carolina, was lawfully married in the city of Brooklyn, in the State of New York, to one Rhoda Baldwin, then a citizen of Brooklyn, and State of New York. That very shortly thereafter, the plaintiff, with his wife, returned to the said city of Columbia, State of South Carolina, his said place of residence, where they lived together as husband and wife until on or about the 7th day of June, 1887, at which date his said wife left his house and home, and moved to the city of Chicago, Cook County, State of Illinois. That on the 14th day of March, 1891, the said Rhoda McCreery, plaintiff's wife, filed in the Circuit Court of said Cook County, State of Illinois, a court of record and general jurisdiction, her bill of complaint against the plaintiff for a divorce *a vinculo matrimonii* from him, in which complaint she alleged that she was an actual resident of the County of Cook, and had been for more than twenty months then last past a resident of the State of Illinois; that on the 4th day of February, 1885, she was lawfully married to the said Charles W. McCreery, and from that time until about the 7th day of June, 1887, she lived with the said Charles W. McCreery as his wife, at which time she was compelled to leave him on account of his extreme and repeated cruelty to her, and further alleging and setting forth in detail his acts of cruelty toward her, extreme and repeated cruelty being one of the causes for which divorces are granted in the statute law of said State of Illinois. That thereupon there issued out of said court, and under the seal thereof, the people's writ of summons, directed to the sheriff of said Cook County, to execute. That said summons, and due notice of the filing thereof and of the complaint, were served upon the plaintiff by publication, in strict accordance with the laws of the State of Illinois, but this plaintiff did not appear, answer, or demur to said complaint. That thereafter, to wit: at the May term, 1891, thereof, there was filed in said Circuit Court of Cook County, a decree affirmatively finding the facts alleged in the complaint of the

said Rhoda McCreery, and ordering, adjudging, and decreeing, that the bond of matrimony theretofore existing between the said Rhoda McCreery and this plaintiff be dissolved, a copy of which decree is hereto attached as exhibit 'B,' and made a part of this agreement.

"2. That plaintiff was seized in fee of the premises first described in said agreement prior to the date of the said decree of divorce, and that he acquired title to the premises second described in said agreement subsequent to the date of said decree of divorce.

"3. That by the statute law of the State of Illinois, Starr and Curtiss' Annotated Statutes, first volume, page 904, paragraph 14, it is provided: 'If any husband or wife is divorced for the fault or misconduct of the other, except when the marriage was void from the beginning, he or she shall not thereby lose dower nor the benefit of any such jointure; but if such divorce shall be for his or her own fault or misconduct, such dower or jointure, and any estate granted by the laws of this State in the real or personal estate of the other, shall be forfeited.' That in volume 1, at page 896, paragraph 1, of said Starr and Curtiss' Annotated Statutes, it is provided: 'That the estate of courtesy is hereby abolished, and the surviving husband or wife shall be endowed of the third part of all the lands whereof the deceased husband or wife was seized of an estate of inheritance at any time during the marriage, unless the same shall have been relinquished in legal form.'

"4. That by act of the legislature of the State of New York, passed in 1828, now section 1756 of the Code of Procedure of said State, it is provided: 'In either of the following cases, a husband or wife may maintain an action against the other party to the marriage, to procure a judgment divorcing the parties, and dissolving the marriage, by reason of the defendant's adultery: 1. Where both parties were residents of this State when the offence was committed. 2. Where the parties were married in this State. 3. Where the plaintiff was a resident of this State when the offence was committed, and is a resident thereof when the action is commenced. 4. Where the

offence was committed within the State, and the injured party when the action is commenced is a resident of the State.'

"5. It is admitted that the deed tendered by the plaintiff did not have a renunciation of dower by Mrs. Rhoda McCreery, wife of grantor.

" '*Exhibit B.*—State of Illinois, Cook County. Circuit Court of Cook County, May Term, A. D. 1891. Rhoda McCreery *vs.* Charles W. McCreery—*Bill.* This day came again the said complainant, by John C. Hendrix and Charles Bary, Esq., as solicitors, and it appearing to the court that said defendant has had due notice of the pendency of this suit, by publication and mailing notice, according to the statute in such case made and provided, that the default of said defendant was taken, and the complainant's bill of complaint herein taken, as confessed by said defendant. And the court having heard the testimony in open court, in support of said bill of complaint (a certificate of which evidence is filed herein), and now being fully advised in the premises, doth find that the complainant is an actual resident of Cook County, and has been a resident of the State of Illinois for over one whole year prior to the filing of the bill in this case, and that defendant has been guilty of extreme and repeated cruelty toward the complainant, as charged in the complainant's bill of complaint. On motion of said solicitors for the complainant, it is ordered, adjudged, and decreed, and this court, by virtue of the power and authority therein vested, and the statute in such case made and provided, doth order, adjudge, and decree, that the bond of matrimony heretofore existing between the complainant, Rhoda McCreery, and the defendant, Charles W. McCreery, be, and the same are hereby, dissolved, and the same are dissolved accordingly.'"

Thereafter, to wit: on the 31st day of May, 1893, his honor, Judge Witherspoon, decreed: "Considering the marriage of Charles W. McCreery as contracted either in this State or in New York, I conclude, as matter of law, that the judgment of divorce granted in Cook County, in the State of Illinois, upon the application of plaintiff's wife, Mrs. Rhoda McCreery, does not dissolve the matrimonial relation of her husband, the plaintiff, Charles W. McCreery, as a citizen of this State. I further

conclude, as matter of law, that the plaintiff is not entitled to compel specific performance of the agreement by the defendant, J. Henry Davis, and that plaintiff's complaint must be dismissed, with costs. The doctrine of estoppel need not be considered, as she is not a party to this action. It is ordered and adjudged, that the plaintiff's complaint be dismissed, with costs."

Thereupon the plaintiff appealed to this court upon ten grounds, which are designed to present in its different phases the question of the duty of our courts (we mean the courts of this State) to recognize as valid the judgment of the Circuit Court for Cook County, in the State of Illinois, whereby Rhoda McCreery and Charles W. McCreery were declared no longer man and wife. We will not reproduce, in this opinion, these grounds of appeal, but direct that they be included in the report of this case.

So far as marriage and the estate of the wife in the lands of which her husband was seized in fee during coverture, which is called dower, are concerned, as fixed under the laws of this commonwealth, they are what were fixed for each under the common law of the mother country. The doctrines of the common law pertaining to marriage and dower are too well understood to need any extended reference. The union of one man with one woman for life in matrimony is a mystery. In nature, man and woman, each for himself and herself, are endowed with those qualities that attract and attach each to the other. They were made for each other. In marriage, we speak it reverently, they gratify the propensities which are unlawful otherwise to gratify. They procreate by this union the species, and thereby perpetuate the race. Their mysterious union is the source of unalloyed pleasure, in the uplifting and development of the natures of both parties composing it. Its very design is its continuance until dissolved by death. It is a unit in social life. A combination of such units make up society. Government itself is but the creation of society, whereby life, liberty, and property are protected. The form of such government is the choice of the units composing it, and all laws are but the expression of rules which the many units, as com-

posing society, may prescribe for their control. No individual human creature can attain excellence in life, in thought, in action, without an ideal before his or her eyes, at which they make effort to attain. Without this ideal, the individual may be said *to drift.* Society being made up of these individual human creatures, and government being their creature, these ideals become incorporated in the framework of their government. One of the ideals before the minds of the members of society is progressive development. Granted that it is never fully attained, still progress towards the goal fixed by the ideal is, in the nature of things, improvement. Now, all admit that the true ideal in marriage is such a perfect union that leads to the indestructibility of the relation of man and wife; for, in its very inception, such is the declared purpose of the parties to · it, and of the society in which it occurs. Such is in exact accordance with the moral law: "And they twain shall be one flesh." England held this view for centuries, and while she held it, the thirteen colonies in America were planted, each adopting this view of the mother country. Of these thirteen colonies, South Carolina was one, and, with the exception of the interval between the years 1872 and 1878, she has constantly retained this view. If others have drifted, she cannot be so charged to have done.

The appellant here contends that marriage is not a civil contract, but a *status,* a condition; that marriage is a *res* that accompanies the husband and wife, or either of them, wherever they, or either of them, may be domiciled. Is marriage a status, not a contract? Is it true that, although formed by a contract by one man and one woman, whereby they, each, for life become husband and wife, that when the union is complete, the man has the status of husband, and the woman the status of wife, separate and apart from the civil contract? Is it true that this status, in each, may be said to exist when separate and apart? Is it true that this status in both, or either one of them, is a *res?* Is it true that either one of them, by becoming domiciled in a State different from that in which the other is then domiciled, thereby gives a jurisdiction to the court of the State of the new domicile of the status of such husband or wife

then domiciled, by which the *res* is under the control of the courts of the new domicile, through which the *res* may be destroyed therein? Is it so that, under the Constitution of the United States, and its subsequent legislation to enforce it, whereby the acts and judgments of one State must be given, by every other State, the same force and effect had in the State where the act was passed or the judgment rendered, a judgment of the State of Illinois, rendered in an action of Rhoda, the wife, against Charles, the husband, for an absolute divorce, granting said divorce, to which action he did not appear, answer, or demur (he being then domiciled in South Carolina), must be recognized by the courts of South Carolina as valid in South Carolina, notwithstanding the State of South Carolina grants no divorces, and especially for the cause of *sævitia*, on which ground this alleged divorce was granted? Or, on the other hand, is it true that the doctrine, that once married always married until one of the parties dies, obtains so firmly in this State, that if the court of any State grants a divorce to either Charles or Rhoda McCreery for any cause save that of adultery, such judgment will not be respected here? We use the qualifying words "of adultery," because divorces are recognized by the State of New York, where this marriage was solemnized, for this cause alone.

We have been delighted with the tone, the ability, and the fidelity with which each side to the controversy has presented its views. That we have been interested, is true. That we have been left in some doubt, at times, is true; but that the conclusion we have reached is now entirely satisfactory to us, is equally true.

These parties, Charles W. and Rhoda McCreery, were married in the State of New York, but immediately thereafter removed to and were domiciled in South Carolina, the home of the said Charles W. McCreery. We are inclined to think that this contract of marriage wears a twofold aspect or character, partaking of certain characteristics under the laws of New York, and partaking again of certain characteristics under the laws of the State of South Carolina, where it was to be performed. Story Conflict of Laws, section 299; 2 Kent, 460. But

concerning this phase of this matter, we do not feel that it will be profitable to devote any time to its discussion, for the divorce in this case, if it be a divorce, was for a cause not recognized in the State of New York or that of South Carolina. Confessedly the contract was entered, therefore, when *sævitia* was not recognized as a ground of divorce. If Mr. Bishop, or Mr. Black, or Mr. Freeman, be correct in their respective views that marriage creates a relation between husband and wife which clothes each one of them with a *status*, and that this *status* in each one of them is entitled to be treated as a *res*, then it will be a matter of no moment where this marriage was celebrated, whether in New York, or in South Carolina, or, for that matter, in any other country.

This view is presented most ably by Mr. Bishop in his work on Marriage, Divorce, and Separation, to which we will have occasion hereafter to refer; and such is his will power and his rugged strength in stating his proposition, together with the masterly arrangement observed in presenting them, that it is with difficulty one escapes his conclusions. We cannot but be impressed, however, with the view that he has taken too much for granted when he announces that, although marriage is entered into by the parties to it under a contract, yet that as soon as the contract is executed, at once there is breathed into the relation an import far higher than a contractual relation—in fine, that a *status* becomes thereby assigned to the parties, over and above and beyond that of any contract. He cites in support of his theory the fact that all contracts may be annulled by the parties who create them except marriage, under which neither party to it, nor both parties to it, can, of themselves, terminate it, and that the law alone can extinguish the contract of marriage. He masses, so to speak, the difficulties in viewing it as a contract as follows: "Marriage, as distinguished from the agreement to marry, and from the act of becoming married, is the civil status of one man and one woman legally united for life, with the rights and duties which, for the establishment of families and the multiplication and education of the species, are, or from time to time may thereafter be, assigned by the law to matrimony. * * * We know that the foregoing definition

of marriage is correct, because it accurately describes what the courts constantly decide. That marriage executed is not a contract, we know, because the parties cannot mutually destroy it; because the act of God incapacitating one to discharge its duties will not release it; because there is no accepted performance which will end it; because a minor of marriageable age can no more recede from it than an adult; because it is not dissolved by failure of the original consideration; because no suit for damages will lie for the non-fulfillment of its duties; because its duties are not derived from its terms but from the law; because legislation may annul itself at pleasure; and because none of its other elements are those of contract but all are of status."

Now, this author admits that Bigelow, J., in *Little* v. *Little*, 13 Gray, 264, correctly stated the proposition, that "all authorities concur in the conclusion that marriage has its origin and foundation in a purely civil contract." This is an, or rather *the*, initial point. How do these authors reach the conclusion, which Dr. Bishop announces, "and though the new relation, that is, the status, retains some similitudes reminding us of its origin, the contract does in truth no longer exist, but the parties are governed by the law of husband and wife?" Is it not an assumption coined in order to give a plausible basis to the solution of an otherwise untenable position? Is it not by this means that they hope to give currency to an otherwise baffled policy, namely: to so construct a plan, that thereby they may successfully invoke that portion of the Federal Constitution relating to the effect to be given by all the States to the acts and judgments of one State, and thus force all other States to give effect to judgments for absolute divorces? If marriage were still esteemed a civil contract, they could not hope to escape the defect of jurisdiction hereafter to be discussed. But by coining this new term, *"status,"* and ascribing the effacacy of *"res"* to it, under certain principles hereafter to be referred to, it is deemed by them that the difficulty has been overcome. We will investigate these later matters hereafter. Just now, we are interested in this discovery made by Dr. Bishop in the year 1852, which seems to have become very popular with all those persons who favor divorce laws.

We still press the inquiry, how have these people changed what was confessedly a civil contract, into a *"status"* or *"res,"* apart from such civil contract? Investigation will show that it is by an assumption of such a result. When pressed for an answer, they say it cannot be changed by the parties, and, therefore, it is not a contract. What principle of law is more ·familiar than what there is in the law pertaining to a certain contract, at the time it is made, becomes a part of such contract, as much so as if specifically named in the contract when made? It is a part of every contract of marriage that it is indissoluble by the parties themselves. Such being so, how need it be said. that such a fact will show that the contract of marriage is not a civil contract, but a *"status?"* Reflection will show that this must be so from the very nature of the union of man and woman in this contract of marriage, and why the law should wisely say to an infant of marriageable age, who has become a party to it, you are as much bound as an adult. Nor does the fact that the act of God incapacitating one party to the marriage to discharge its duties, will not release the other from the marriage, for such was the law when the contract was entered into. It did not need this "status" to show such result. Nor does the fact that no accepted performance will annul it; for how can there be an accepted performance of a contract that is not fully performed until one of the parties thereto shall die? Nor does the fact that no action will lie in behalf of one of the parties against the other for a non-fulfill-ment of its duties. Such is of the very essence of the law existing when it is entered into. Nor will the alleged fact that its duties are not derived from its terms. On this point we suppose the author means, that when the marriage is solemnized or contracted, an exact inventory is not made up, or a list of the duties incident to marriage repeated in the presence of the parties. The wise God, who created us, furnished us those incentives to the union in our very physical organization when he made us male and female; no necessity existed to repeat what each already knew. Besides, in the eyes of the law, their duties existed as incidents to this union, and were incorporated in the contract when it was formed.

Again, they say it is not a civil contract, because the legislative power may annul the marriage at will.  Governmental force has annulled many solemn contracts, and such a fact has never been held to sustain the position that contracts were not contracts on that account.  It needs no extended reference to history to learn of the exercise of this governmental force. The horror of mankind at the conduct of King Henry VIII., as to divorces from his wives, is an apt illustration of this governmental force.  And, lastly, (now listen!) because none of its other elements are those of contract, but all are of status. In other words, the author would have us believe it is not a contract, because he says it is not a contract; it is a status, because he says it is a status!  And this is a proof that an executed civil contract is no longer an executed civil contract, but, instead, has become a *"status."*  Just here it might be well to call attention to the fact that, in the author's definition of marriage, it no where appears that he has considered what the Creator of the Universe announced as the cause of woman's creation: "And the Lord God said, It is not good that the man should be alone: I will make him a helpmeet for him."  Genesis 2:18.  Any idea of marriage which leaves out of view the companionship of the husband and wife, ignores one of the chief beauties of the union, and one of its most attractive features.  It may be assumed, however, that it was so much more important to coin this "status" and originate this "res," in connection with marriage, that many things necessary to the true conception of marriage might be well overlooked by Dr. Bishop and his allies.

Before referring to the author more directly in regard to the pernicious effect of his new doctrines, it is but just to say that in his work, so largely relied upon by the appellant here, and whose title has already been stated, and from which such heavy quotations have been made, he intimates that divorces should be confined to the cases of adultery, desertion, and *sævitia*. While this is true, he distinctly lays down doctrines that are at variance with Holy Writ, and seems to take pleasure in the reflection that he first coined the terms "status" and "res" as applied to marriage and divorce.  Now, candor compels us to

say that the good doctor occupies very dangerous ground.
That instead of deriving consolation from these reflections, he
might really view them with consternation and terror! If his
views so announced are calculated to lead his kind to disregard
the Sacred Law, then, indeed, he is in peril! There is no need
to announce, for it must be patent to every one who thinks,
that one of the direct results of this pandering to divorce is
sure to prove one of the most potent agencies to the poisoning
of the public mind, by not only suggesting evil, but by suggest-
ing a plausible excuse for it. When the ends of the creation
of man and woman, as Nature hath made them, are perverted,
and man, who was created the stronger, and, therefore, the
protector of woman, and woman, who was created the weaker,
and, therefore, the protected, are made equals, with no induce-
ment to reverence man by woman as her temporal lord, and no
incentive to man to tenderly protect and cherish woman as the
weaker sex—then the bonds of society are weakened, indeed,
and the restraints, that a different course would tend to increase,
are lost to society.

But one of the chief difficulties in this case is this: Grant
that marriage in South Carolina is a civil contract, indissoluble
by any act of the parties, and, under her laws, indissolu-
ble in her courts for any purpose, yet if Mrs. McCreery
has received an absolute divorce from her marriage by
the judgment from a court of general jurisdiction in the State
of Illinois, and, under the Constitution of the United States
(art. 4, sec. 1), and the act of Congress to carry the same into
effect, the judgment of the Illinois court, when pleaded or of-
fered in evidence in the courts of South Carolina, the latter
State must receive the same with like force and effect, that it
obtains in the State of Illinois, where rendered; and that if this
be so, Mrs. McCreery is entitled to no dower in the lands owned
by Charles W. McCreery in South Carolina, and, therefore, the
plaintiff is entitled to his decree for specific performance of the
contract between himself and the defendant. This section of
the Constitution reads as follows: "Full faith and credit shall
be given in each State to the public acts, records, and judicial
proceedings of every other State. And the Congress may, by

general laws, prescribe the manner in which such acts, records, and judicial proceedings shall be proved, and the effect thereof." And the act of Congress, 1 Stat. at Large, 122, provides: "The said records and proceedings, authenticated as aforesaid, shall have such faith and credit given to them in every court within the United States, as they have by law or usage in the courts of the State from whence the said records are or may be taken."

It will be at once seen that the framers of our Federal Constitution have, by this section, provided that while under the law of nations, from principles of comity, the judgments of foreign countries should be respected as such in every other country when produced, provided such foreign judgments accord with her domestic policy, &c., *that it should be the duty of every State* in this Union of States to give full force and effect to the judgments of any other State when duly authenticated. Hence, if this doctrine is sound law, holders of judgments obtained in a different State have the right to produce such judgments in the courts of this State, and it is our duty to respect them and give them the same force and effect they have in the State where rendered, as required by the Constitution of the general government. We would properly and naturally look to the adjudications in the Supreme Court of the United States for the interpretation of this legislation, and in doing so, we find a goodly number of cases bearing upon this matter. Among these cases are *Rose* v. *Himely*, 4 Cranch, 269; *Mills* v. *Duryee*, 7 *Id.*, 484; *Hampton* v. *McConnel*, 3 Wheat., 234; *McElmoyle* v. *Cohen*, 13 Peters, 312; *Landes* v. *Brant*, 10 How., 348; *Webster* v. *Reid*, 11 *Id.*, 437; *D'Arcy* v. *Ketchum*, *Ibid.*, 165; *Harris* v. *Hardeman*, 14 *Id.*, 334; *Christmas* v. *Russell*, 5 Wall., 290; *United States* v. *Arredondo*, 6 Peters, 691; *Wilcox* v. *Jackson*, 13 *Id.*, 498; *Thompson* v. *Whitman*, 18 Wall., 457; *Hanley* v. *Donoghue*, 116 U. S., 4; *Cole* v. *Cunningham*, 133 *Id.*, 107. And there are other cases.

We cannot undertake to quote from all these cases. Two will suffice. In *Thompson* v. *Whitman*, *supra*, Mr. Justice Bradley, who delivered the judgment of the court, in effect, held that "neither the constitutional provision that full faith and

credit shall be given in each State to the public acts, records, and judicial proceedings of every other State, nor the acts of Congress passed in pursuance thereof, prevent an inquiry into the jurisdiction of the court by which a judgment offered in evidence was rendered. The record of a judgment rendered in another State may be contradicted as to the facts necessary to give the court jurisdiction; and if it be shown that such facts did not exist, the record will be a nulity, notwithstanding it may recite that they did exist. Want of jurisdiction may be shown either as to the subject matter, or the person, or in proceedings *in rem*, as to the thing." (Syllabus of the case.) It was also held, "that the want of jurisdiction of the court by which a judgment is rendered in any State may be questioned in a collateral proceeding in another State, notwithstanding the provisions of the fourth article of the Constitution and the law of 1790, and notwithstanding the averments contained in the record of the judgment itself." And in *Hanley* v. *Donoghue, supra,* it was said: "Judgments recovered in one State of the Union, when proved in the courts of another (State), differ from judgments recovered in a foreign country in no other respect than that of not being re-examinable on the merits, nor impeachable for fraud in obtaining them, if rendered by a court *having competent jurisdiction of the cause and of the parties"* (italics ours).

Very naturally we ask, did the court of the State of Illinois have jurisdiction of Charles W. McCreery when it rendered the judgment of divorce? It is conceded that at no time, either when such action was commenced, or while it was pending, or when decided, was Charles W. McCreery within the limits of the State of Illinois. He did not appear in such action, nor answer nor demur. His domicile has never been in the State of Illinois, but, on the contrary, at all times in the State of South Carolina. Jurisdiction was aptly defined in *U. S.* v. *Arredendo,* 6 Peters, 691, to be the authority of the court to take cognizance of the cause or controversy at bar. The authenticated judicial record is that of an action wherein Rhoda McCreery is styled plaintiff and Charles W. McCreery is styled defendant, and the judgment therein purports to dissolve the

marriage of the said Rhoda and *Charles.* We assume that it will be admitted on all hands that if it should be contended that such judgment was one *in personam*, it is an absolute nullity; for, as before stated, Charles W. McCreery was not within the jurisdiction of the court, and the only plan by which the courts of Illinois, under her statutes, sought to have him within its jurisdiction, was by the publication of a notice in one of its newspapers, addressed to said Charles W. McCreery, of the pendency of the action commenced by his wife.

The principle that if the action was *in personam* it is a nullity, is enforced in the United States Supreme Court in the case of *Pennoyer* v. *Neff*, 95 U. S., 714. In that case one Mitchell held a debt against Neff, and, while Neff was beyond the limits of the State of Oregon, said Mitchell brought suit against Neff to recover his debt. In that suit, notice of the pendency of the same, and requiring Neff to appear and plead, was duly published in a newspaper, as required by the statute of the State of Oregon in such cases made and provided; but Neff neither made appearance nor did he plead. Judgment was rendered against Neff, and the sheriff sold a tract of land owned by Neff in said State. Pennoyer became the purchaser at said sale, and brought his action against Neff to recover the land. In this action by Pennoyer, Neff denied the validity of Mitchell's judgment, under which the land was sold, because he was not in the State, and service was alone by publication. The Supreme Court of the United States decided that the court of Oregon was *without jurisdiction to render such judgment*, and dismissed Pennoyer's action. The Supreme Court of South Carolina, in the action of *Tillinghast* v. *Boston & Port Royal Lumber Co.* and *Moore* v. *S. C. Forsaith Co.*, 39 S. C., 484, adopted the same view, and held that jurisdiction as to defendant out of this State could not be acquired by publication so as to make judgment *in personam*. And the subsequent cases of *Toms* v. *Richmond &c. R. R. Co.*, 40 S. C., 520, and *Gibson* v. *Everett*, 41 S. C., 22, have enforced such doctrine.

But now comes the difficult question, which is raised in this way: Mrs. McCreery having resided in the State of Illinois for more than twenty months before she instituted her action for

divorce against Charles W. McCreery, and as under the statute law of Illinois service upon an absent defendant may be made by publication of the summons in some newspaper in that State to be fixed by the court, it is contended, first, that it is always in the power of a State, through her courts, to establish the *status* of her own citizens, and that this was done in the case of Mrs. McCreery. Now, if marriage, by operation of law, creates the *status* of wife in Mrs. McCreery when she removes her domicile to that State, and such *status* is a *res*, then under *Pennoyer* v. *Neff*, *supra*, *Tillinghast* v. *Boston & Port Royal Lumber Co.*, and *Moore* v. *S. C. Forsaith Co.*, *supra*, *Toms* v. *Richmond &c. R. R. Co.*, and especially *Gibson* v. *Everett*, *supra*, there would be a *res* in the State of Illinois, upon which the courts of the State of Illinois might fasten by attachment, or similar process, which would enable them to pass upon the right to relieve Mrs. McCreery from her marital relation to Charles W. McCreery, as her husband, notwithstanding his absence and service by publication alone.

If marriage is a civil contract, whereby the domicile of the husband is the domicile of the wife, and whereby the contract between them was to be located in that domicile, it is difficult to see how the absence in another State of either party to such contract from the State where was located the domicile of the marriage, could be said to carry such contract to another State, even if we were to concede that an idea, a mental apprehension or metaphysical existence, could be transmuted so as to become capable of attaching to it some process of a court, whereby it might be said to be under the exclusive jurisdiction of such court. If Mrs. McCreery could carry that *res* in the State of Illinois, then Mr. McCreery had the same *res* in the State of South Carolina, at the same time. In other words, the same thing could be in two distinct places at one and the same time, of which *res* the courts of Illinois would have the power to control as if it were a physical entity, and of which *res* the courts of South Carolina would have the power, at the same moment of time, to control as if it were a physical entity. Such a conclusion would be absurd.

The justice who delivered the opinion in the case of *Pennoyer*

v. *Neff, supra,* by way of illustration merely, *purely as a dictum,* for that case had no earthly connection with marriage, did say in that opinion: "To prevent any misapprehension of the views expressed in this opinion, it is proper to observe that we do not mean to assert by any thing we have said, that a State may not authorize proceedings to determine the *status* of one of its citizens to a non-resident, *which would be binding within this State* [italics ours], though made without service of process or personal notice to the non-resident. The jurisdiction which every State possesses to determine the civil status and capacity of all of its inhabitants, involves authority to prescribe the conditions on which proceedings that may affect them, may be commenced and carried on within its territory. The State, for example, has absolute right to prescribe the conditions upon which *the marriage relation between its own citizens shall be created and the causes for which it may be dissolved* [italics ours]. One of the parties guilty of acts for which, by the law of the State, a dissolution may be granted, may have removed to a State where no dissolution is granted. The complaining party would, therefore, fail, if a divorce were sought in the State of the defendant; and if application could not be made to the tribunals of the complainant's domicile in such cases, and proceedings be there instituted without personal service of process or personal notice to the offending party, the injured citizen would be without redress."

Now if the remarks, as dictum alone, of Mr. Justice Field, were intended to be restricted by him to such cases where the marriage contract was executed while the domicile of both parties was in that State, and where the laws of such State authorized the granting of divorces, we suppose it correctly sets forth the law that should govern in such a case. But if it is intended to announce that such a conclusion would be proper, in a case where a marriage contract was made in· a State where both were domiciled, and in a State where divorce is not allowed, and where one of the parties to such contract of marriage should remove to a State where divorces are allowed, and there institute an action for divorce, causing the other party to the marriage contract to be served by publication

alone, to which said latter party paid no attention, and a judgment for divorce was granted, we submit that such judgment is erroneous, so far as the same relates to the absent defendant, by the decisions of the Supreme Court of the United States. The defendant has the right to interpose as a defence to such wrong, that he has been denied due process of law, to interpose for his protection from such judgment the fourteenth amendment to the Constitution of the United States, which provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." It was concerning this very protection under this fourteenth amendment, that Mr. Justice Field, in the case of *Pennoyer* v. *Neff, supra,* said: "Since the adoption of the fourteenth amendment to the Federal Constitution, the validity of such judgments (where no personal service was made, or appearance entered or pleading made), may be directly questioned, and their enforcement in the State restricted, on the ground *that proceedings in a court of justice to determine the personal rights and obligation of parties over whom the court has no jurisdiction, do not constitute due process of law*" [italics ours].

Charles W. McCreery and Rhoda, his wife, whether it be said their contract should be governed by the laws of the State of New York, where the marriage was solemnized, or whether in the State of South Carolina, which was the husband's domicile and where he is still domiciled, and where the marriage was to be performed, never agreed that their rights, duties, and liabilities, as husband or wife, should be determined by the State of Illinois, or that the determination of these rights, duties, and liabilities might be had in an action for divorce for *sævitia,* where service upon either of them might be made by publication. And when, therefore, a judgment of this last named State [was rendered] in an action to which Charles W. McCreery was no real party, such judgment was a nullity as to him. In the opinion of Mr. Justice Field he further said on this point: "Whatever difficulty may be experienced in giving to these terms (due process of law) a definition which will embrace every permissible exertion of power affecting private rights, and exclude such as is forbidden, there can be no doubt as to

their meaning, *when applied to judicial proceedings.* They then mean a course of legal proceedings according to those rules and principles which have been established in our system of jurisprudence for the protection and enforcement of private rights. To give such proceeding any vitality, there must be a tribunal competent by its constitution—that is, by the law of its creation—to pass upon the subject matter of the suit; and if that involves merely a determination of the personal liability of the defendant, he must be brought within its jurisdiction by service of process within the State or his voluntary appearance."

Can there be any doubt but that the judgment of the court of the State of Illinois does directly impinge upon the personal rights and liabilities under his contract of marriage of Charles W. McCreery with Rhoda McCreery? By that contract, her personal presence with him was his right. It was his privilege under his contract of marriage to receive at her hands those ministrations incident to the marriage state. To allow this Illinois judgment to be effective as a divorce to Charles W. McCreery cannot be law! In *Hull* v. *Hull,* 2 Strob. Eq., 174, it was held that Gideon J. Hull having married his wife while both were domiciled in the State of Connecticut, under whose laws it was competent for either party to obtain a divorce for desertion, and in such a suit service might be made by publication, and having deserted his wife and thereafter she having procured a divorce from him *a vinculo matrimonii* in an action wherein he was served by publication, that such divorce was valid. This judgment was rendered because the marriage contract between them was said to have been made with all the provisions of the laws of Connecticut pertaining to marriage, including divorce, as part and parcel of such contract of marriage. And this was done and adjudged notwithstanding the State of South Carolina did not allow divorces.

Again, we say we refuse to recognize this judgment of the court of the State of Illinois as valid in our State, because there was no such thing as a status or res in the conception or in the records of these parties when the marriage was made by them. But even if we were to concede, for the sake of argument, that marriage created a *status* or *res,* as contended for by the appel-

lant, we do not concede that the courts of this State are bound to give it such effect here. The utmost that could be asked at our hands would be the recognition of the doctrine, that within the limits of the State of Illinois, Mrs. McCreery was not the wife there of Charles W. McCreery. Dr. Bishop has likened his status of husband and wife to that of parent and child, guardian and ward. A close examination of the decisions of the States will show that the status accorded in our State to the child is not that necessarily accorded in other States, even where such status is established by the judgment of the courts of one State, which is duly authenticated and introduced in the courts of a different State. The industry of respondent's attorney, Mr. H. Cowper Patton, has brought to our attention these cases:

(1) *Barnum* v. *Barnum,* 42 Md., 251. Here John B. Barnum was the child of parents living in the State of Arkansas, but who were not married at his birth. Subsequently, the legislature of the State of Arkansas was induced to pass an act legitimatizing said John D. Barnum as the child of his parents. Subsequently, there was property in the State of Maryland that under her laws would pass to the legal issue of John B. Barnum's father. Thereupon John B. Barnum brought his action in the courts of the State of Maryland to recover this property. It was there conceded that the property could be recovered by him if he was entitled to maintain the status of a child of his father. The statute of Arkansas was relied upon for that purpose, but the court held that he was not thereby made the child of his father in Maryland. The language of the decision on this point was as follows: "This act could have no extra territorial operation whatever, except as to any rights that may have been acquired under it in the State of Arkansas. As to such, it ought to be respected everywhere (Story Conf. L., 101, 102). But as to capacity to acquire property beyond the State passing the act, by virtue of the particular *status* given the party, that the legislature could not confer. Even if the act had professed to legitimate John B. Barnum, without reference to a previous marriage, it could have no operation here,

and no rights involved in this case could be affected by it. This would seem to be clear both in reason and authority."

(2) The case of *Smith* v. *Derr's Administrators*, 34 Pa. St., 126. Here the brother of the deceased testator, Daniel Derr, who lived in the State of Tennessee, was the father of an illegitimate daughter, Nancy. On his petition, Nancy was duly legitimated by a decree of the Circuit Court of Giles County in said State (Tennessee), where she then and still resided. And the question presented in the case just cited was, whether she had any interest in the estate of the deceased testator, who lived and died in the State of Pennsylvania. The court said: "Nancy is the illegitimate niece of the testator, born in Tennessee, and legitimated there on the petition of her father by a proceeding in court. This forgives the vice of her birth in Tennessee, but not here. * * * A capacity in Tennessee does not prove capacity here. So far as our law is concerned, legitimation by the subsequent marriage of the parties abroad, by act of a foreign legislature, or by judicial decree abroad, are all fruitless. If they are allowed to constitute inheritable capacity, then adoption might have the same effect. Then we should be without any law of inheritance, in favor of relationship in other States, except such as our neighbors should be pleased to give us."

As to the matter of guardian and ward, it is proper to say there is a *status* assigned to each, under the law, where such relation is established. But when the guardian attempts to assert his *status* as such, in a State different from that wherein his appointment was made, the latter State refuses to recognize it. The decision of the United States Supreme Court in the case of *Hoyt* v. *Sprague*, 103 U. S., 631, is in point here. In that case Mr. Justice Bradley, as the organ of the court, said: "One of the ordinary rules of comity exercised by some European States, is to acknowledge the authority and power of foreign guardians—that is, guardians of minors and others appointed under the laws of their domicile in other States. But this rule of comity does not prevail to the same extent in England and the United States." * * * "In regard to real estate, it is entirely disallowed, and is rarely admitted in re-

gard to personal property. Justice Story, speaking of a decision which favored the ex-territorial power in reference to personal property, says: 'It has certainly not received any sanction in America in the States acting under the jurisprudence of the common law. The rights and powers of guardians are considered as strictly local, and not entitling them to exercise any authority over the person or personal property of their wards in other States, upon the same general reasoning and policy which have circumscribed the rights and authorities of executors and administrators.'' And let it be noticed, that in the State of Rhode Island, when the *res* was located in the case just referred to, and when a court, by its judgment, has acted on that *res*, it was decided that such judgment had no extra teritorial operation.

If, then, acts of the legislature and judgment of courts of States, pertaining to *status* of parent or child, guardian or ward, will not be entitled, when the said acts or judgments have been duly authenticated and presented in the courts of different States, to give such persons the same *status* as that obtained in the State where rendered, why should a different rule prevail touching the status of a husband or wife?

As far as the Supreme Court of the United States has ever gone in the matter of divorce, is to assert that, for the purpose of obtaining a divorce, a wife may acquire a domicile apart from that of the husband; that divorce, when granted, does not impair the obligation of a contract; that it is in the power of a legislature in a State different from that of the domicile of the married parties to grant a divorce which is operative in the State where granted; that it is the exercise of a legitimate power when the State legislature grants a divorce, either by the legislature acting directly or by conferring a power to do so upon the courts of that State, provided the Constitution of such State does not deny such power, that a divorce so granted is effective, even without the residence of both parties in the State at the time the divorce is granted. *Cheever* v. *Wilson*, 9 Wall., 108; *Maynard* v. *Hill*, 125 U. S., 190. In the first case cited, both parties, husband and wife, appeared to the action in the court of the State of Indiana, where the divorce was

granted.  In the second cited, the legislature of the Territory of Washington acted on the prayer of the husband, in the absence from that territory of the wife.  But the Supreme Court of the United States has been careful to deny that the courts of the United States Government had any original jurisdiction in the matter of granting divorces.  And it may be as well to say, that in both of the cases just cited, rights of property were involved under divorces which affected the rights of third parties.

Another reason which may be advanced why the conclusions of the Circuit Judge, in denying force and effect to this Illinois judgment of divorce, should be sustained by this court, is that the whole record may be examined to see if the court pronouncing the judgment had jurisdiction, and that even if it be admitted that divorce judgments should have accorded to them extra territorial effect, in case the record discloses that such court based its judgment upon the seizure of the *res*, this authenticated judgment is silent as to any such jurisdictional allegation.  But while this is true, we prefer to meet the issue as it has been joined in the case at bar, and, therefore, we base our refusal to give force and effect to the judgment of divorce as rendered by the court of the State of Illinois, upon the grounds already indicated.

It may not be amiss to refer to our own laws on the subject of marriage and divorce.  As already indicated, we admit that there is no power in any court in South Carolina to grant any divorce, other than that *a mensa et thoro*.  While this latter divorce is a judicial barrier to any attempt to exercise the rights or enforce the duties of the parties affected by the judgment, yet the courts are only too willing to have the paries restored to their original *status quo*, upon good cause shown.  While the remedy is a harsh one, and to a certain extent interferes with the operation of the laws of nature, still woman must be protected!  After all, an unbending adhesion to the laws of the right living, has a healthy effect upon the lives of others.  If self-denial is thus necessitated, it should not be forgotten that many natures are perfected through its beneficent influence.  True philosophy would extract good

from every condition. As to our law on the subject of divorce, we apprehend that the expressions used and admissions already made, show that in the State of South Carolina we do not recognize the power in our courts to grant divorces *a vinculo matrimonii.* By art. IV., sec. 15, of our Constitution, the Courts of Common Pleas have exclusive jurisdiction in all cases of divorce, and by art. XIV., sec. 5, divorces from the bonds of matrimony shall not be allowed, but by the judgment of a court as shall be prescribed by law. Thus the General Assembly is denied the power to grant divorces directly, but is permitted to clothe the Courts of Common Pleas with that power. This last they have refused to do, by repealing the act of 1872, which did permit the courts to grant divorces in this State for adultery. Thus we have the common law restored to us on this subject. And, as before remarked, the common law is at variance with the dissolution of marriage by divorces. We might add case after case from our reports on this subject, but they would every one confirm this doctrine.

It may be proper to say, that if the present contention had been made in the courts of the State of New York, and an effort had been made there to interpose the divorce *a vinculo matrimonii* granted by the court of the State of Illinois, on the ground of *sævitia* practiced by the husband, McCreery, upon the person of his wife, the courts of the former State (New York) would have refused to give such judgment of divorce any effect. In the leading case of *People* v. *Baker*, 76 N. Y., 78, the husband had been married to Sallie West in the State of Ohio, in the year 1871, and thereafter the married couple resided at Rochester, in the State of New York. Some time afterwards the wife, Sallie West, returned to the State of Ohio, and began her action against Baker for an absolute divorce, on the ground of gross neglect of duty by the husband. The husband was domiciled in the State of New York during the pendency of such divorce proceedings in the State of Ohio, and did not appear in or plead to such action. Divorce was granted. The husband, Baker, *still* domiciled in the State of New York after such judgment of divorce, married again, whereupon he was indicted in the court of New York for big-

amy. Being convicted, an appeal was taken. Thereafter the appeal from such judgment was finally considered in the Appeal Court in the State of New York, and the conviction was there affirmed. The court held, among other things, in answer to the question: "Can a court in another State adjudge to be dissolved and at an end the matrimonial relation of a citizen of this State domiciled and actually abiding here throughout the pendency of the judicial proceedings there, without a voluntary appearance by him therein, and with no actual notice to him thereof, and without personal service of process on him in that State?" The court answered this question squarely in the negative, and that, too, after reviewing the federal decisions bearing on the subject. Many citations are made of New York decisions and those of other States by Judge Folger, who pronounced the judgment of that court.

So, too, in the case of *Jones* v. *Jones*, 108 N. Y., 415, although the Court of Appeals of New York upheld a divorce of a New York marriage by the courts of Texas, it was done because the husband, who was domiciled in the State of New York when the wife began her action for divorce in the courts of the State of Texas, appeared in said action and answered to the merits of the action. The Appeal Court of the State of New York was careful to announce in its judgment, "that the marriage relation is not a *res* within the State of a party invoking the jurisdiction of a court to dissolve it, so as to authorize the court to bind the absent party, a citizen of another jurisdiction, by substituted service or actual notice of the proceeding, given without the jurisdiction of said court, and like other contracts, the contract of marriage cannot be annulled by judicial sanction without jurisdiction of the person of the defendant." (Extract from the syllabus of the case cited.)

And also the case of *Williams* v. *Williams*, 130 N. Y., 193, decided in December, 1891, is in point as illustrating the attitude of the courts of New York on this question of divorce, so far as judgment therefor rendered by the courts of a State different from that in which the domicile of the defendant was had, and to which action for divorce he neither appeared nor answered. In the case just cited, the leading facts seemed to be these: The

husband, after living a year or more with the wife after their marriage, demanded that the wife should give up all intercourse with her mother. This at first the wife declined to do, and he then lived apart from her. But before the husband removed to the State of Minnesota, the wife made an unconditional offer in good faith to live with her husband. This last proposition he declined, and removed to the State of Minnesota, where he commenced an action for absolute divorce on the ground of desertion. To this action the wife was made a party by publication. She was not in the State of Minnesota at any time, nor did she appear or plead to his action. Still, the judgment adjudged that the parties were no longer husband and wife. When this husband returned to the State of New York, the wife brought her action for a separation of the parties from bed and board forever, on the ground of abandonment. The husband attempted to set up in his answer, his judgment for absolute divorce obtained in the courts of the State of Minnesota. But the court declined to recognize such a divorce as valid, and granted the wife's prayer for a legal separation for life. In the opinion of the court in the case just cited, the court admitted that every State may adjudge the status of one resident therein towards a non-resident, and that so long as such judgment is confined in its operation to the territorial limits of that State, other States must acquiesce; but it tenaciously adhered to the position announced in *Jones* v. *Jones, supra*, that "the marriage relation is not a *res* within the State of a party invoking the jurisdiction of a court to dissolve it, so as to authorize the court to bind the absent party, a citizen of another jurisdiction, by substituted or actual notice of the proceedings given, without the jurisdiction of the court where the proceeding is pending."

We have thus taken the pains to consult the decision of the courts of the State of New York for the purpose of showing, that even if the marriage could be regarded as a New York marriage, the divorce here in question could not be regarded as valid. Having been admitted that the courts of New York are only allowed by the laws of that State to grant absolute divorces for adultery, and the alleged judgment of the courts

of the State of Illinois having granted the same on account of cruelty of the husband to the wife, it will be easily seen that Mrs. McCreery's contract of marriage did not have, as a part thereof, any right to divorce except for adultery. But it might have been contended that, at the time she entered into such contract of marriage within the State of New York, that State recognized as valid any judgment of divorce granted by other States than New York. This refuge is denied her, for we have seen such is not the case, in the event such a judgment of absolute divorce was granted by the courts of any other State in an action therefor to which the husband was not a party.

But the appellant suggests that divorces must be recognized in this State under the section of our General Statutes which reads as follows: "All marriage contracted while either of the parties has a former wife or husband living, shall be void: *Provided,* That this section shall not extend to a person whose husband or wife shall be absent for the space of seven years, the one not knowing the other to be living during that time; nor any person who shall be divorced, or whose first marriage shall be declared void by the sentence of a competent court." Upon examination we found that that statute was adopted from the mother country when it was passed in the year 1712. We have no adjudications in our courts construing the statute, and yet we find that in the mother country, the matter of divorce was never allowed under her laws until the year 1857. We do not propose to pursue the question to any extent. It cannot be considered that the divorce referred to in our statutes could be other than a valid divorce—a divorce legal in its operation. As the States of New York and South Carolina recognize no divorces valid for the cause of cruelty of the husband to the wife, as is the present case at bar, it follows necessarily that no possible advantage can accrue to the appellant under this old statute.

Lastly, the appellant suggests that the plaintiff's titles tendered to the defendant are good and sufficient, notwithstanding the dower of Mrs. McCreery has not been renounced, and notwithstanding the judgment of divorce of the Illinois courts is void, because she would be estopped from

15—44

making claim to dower. We do not care to base our views on this branch of the case upon the ground set out in the Circuit decree, namely: that Mrs. McCreery is not a party to this case. In Courts of Equity, when questions of enforcing demand for specific performance of contracts are considered, we are not by any means prepared to say that the presence of a party, who may possibly possess some right affecting the title tendered, is always necessary, before the court will proceed to pass upon such contract. Certainly in the case at bar, by the agreed statement of facts, it is admitted that this decree of divorce obtained in Illinois especially reserved the question of Mrs. McCreery's right of dower. Apart from this, however, under our laws, we know of no way to defeat a woman's right of dower that has once attached, unless it be under that section of our General Statues, 1903, which provides, if a wife elopes with another than her husband, and continues with her *advoutrer*, and is not reconciled thereafter with her husband, she shall forfeit her dower in his lands. Under our law, "marriage is a valuable consideration; some have considered it the highest known in law. None would say it was a lower consideration than money."

There is nothing unreasonable in this. The great value of "the consideration consists in this, that the wife surrenders her person and her self-dominion to the husband, and enters into an indissoluble engagement with him, foregoing all other prospects in life; and if the consideration for which she stipulates fails, she cannot be restored to the *status in quo*. She can have no remedy or relief." *Rivers* v. *Thayer*, 7 Rich. Eq., 144. In *Wilson* v. *McConnell*, 9 Rich. Eq., 513, the court used this language: "But this claim is met by a corresponding equity on the part of the widow, who is entitled (under her marriage) to the position of a purchaser for valuable consideration against all but existing liens"—liens that existed before the marriage. So in *Brooks* v. *McMeekin*, 37 S. C., 303, this court held: "We are, therefore, enabled to declare it to be the law, as derived from our own decisions, that in this commonwealth marriage is a valuable consideration, paid by the wife for those rights and estates that, by our laws, are accorded the wife *as a wife.*"

It is true, at present, this right of dower of Mrs. McCreery in the lands of her husband, the plaintiff, is inchoate, yet it is a substantial right of property, and not a lien.    *Shell* v. *Duncan,* 31 S. C., 547.    It must be remembered, that this action of Mrs. McCreery in the courts of Illinois related only to the present and future relation of herself to her husband; it did not seek any action of the court as to the past, for she admitted she had been his lawful wife from 1885 to the date of her alleged judgment of divorce from him.    We have held that this divorce is void in this State.    It seems to us, therefore, that the plaintiff can derive no benefit from the alleged estoppel.

It is the judgment of this court, that the judgment of the Circuit Court be affirmed.